UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------------------------- x

MARY AMES, *et al*.                                              :

                                                                :

                              Plaintiffs,                       :

                                                                :     **MEMORANDUM &**
        -against-                                               :     **ORDER**

                                                                :

TRINA SEXTON, *et al.*,                                         :     3:24-CV-00929 (VDO)

                                                                :

                              Defendants.                       :

---------------------------------------------------------------- x

**VERNON D. OLIVER**, United States District Judge:

Plaintiffs Mary Ames ("Ames") and Brianna Triplett ("Triplett") (collectively, "Plaintiffs") are inmates in the custody of the Connecticut Department of Correction ("DOC") and incarcerated at the York Correctional Institution ("York CI"). Plaintiffs adhere to the Native American religion. They practice their religion through smudging and with the use of sacred medicine bags. This action challenges Defendants' alleged practice of infringing on Plaintiffs' right to practice their religion by denying opportunities to smudge and improperly handling their medicine bags. Plaintiffs also claim that York CI's policies demonstrate a preference for other faiths.

After the initial review process, the Court permitted this case to proceed under the Religious Land Use and Institutionalized Persons Act ("RLUIPA") and under 42 U.S.C. § 1983 for alleged violations of Plaintiffs' Free Exercise and Establishment Clause rights under the First Amendment, as well as their right to Equal Protection under the Fourteenth Amendment. Additionally, after the initial review process, the Court permitted the case to proceed against fifteen of the named defendants in their individual and official capacities: Warden Trina Sexton, Deputy Warden Michael Beaton, and Correction Officers ("C.O.")

Hunter, Adetola, Burgos, Brooks, Cabrera, Duntz, Lebron, Neel, Myers, Kamal, Santini, Mercado, and Whitlock (collectively, "Defendants").

Before the Court is Defendants' motion for summary judgment (the "Motion"). After careful review of the record, the Court **GRANTS IN PART** and **DENIES IN PART** the Motion.

## I.     BACKGROUND

The following facts are undisputed and are based on the record, including the parties' pleadings and Local Rule 56(a) statements.[1]

### A.     Practice of the Native American Religion at York CI

Plaintiffs Ames and Triplett practice the Native American religion with the use of sacred medicine bags,[2] and through smudging.[3] Smudging is a prayer and healing practice using sage, sweetgrass, or tobacco and burning it in a shell with a feather used to guide the fragrant smoke around a person,[4] which cleanses and removes negativity from a person before prayer.[5] At York CI, the practice of smudging is outlined by the Native American Smudging Policy, which requires each inmate participating in smudging to sign a memorandum of

---

[1]The operative pleadings are the Plaintiffs' Complaint (Compl., ECF No. 1) and the Defendants' Answer (Answer, ECF No. 23). The parties' Local Rule 56(a) statements include: Defendants' Local Rule 56(a)1 Statement of Undisputed Material Facts ("Def. 56(a)1," ECF No. 32-2) and Plaintiffs' Local Rule 56(a)2 Statement of Facts in Opposition to Summary Judgment ("Pl. 56(a)2," ECF No. 54). All citations to documents refer to the pagination in the ECF header unless otherwise noted.

[2] Pl. 56(a)2, ECF No. 54 ¶ 31.

[3] *Id.* ¶¶ 9–10.

[4] *Id.* ¶ 10.

[5] *Id.* ¶ 61–62.

understanding and use agreement acknowledging York's smudging policy and procedures.[6] The practice of smudging is also governed by Administrative Directive ("A.D.") 10.8, which is a directive outlining religious services for inmates.[7]

Smudging for inmates at York CI takes place in an outdoor area on the facility grounds.[8] A supervising staff person will supply matches or a lighter to an inmate for the purpose of smudging.[9] When an inmate finishes smudging, their materials are stored and maintained by a staff member.[10] Dry smudging—using a feather for smudging oneself—may be a substitute prayer format for inmates who are ineligible or unable to smudge in the traditional manner, and it is  practice that can be done in a cell.[11] In the facility at 9:00 p.m., an announcement is made that either smudging is to commence, or that it is cancelled and dry smudging is available.[12] There are certain times when smudging is unavailable at York CI, for instance, during a full lockdown, when all inmate movement throughout the facility is generally stopped.[13] Thus, when a lockdown is called, if it overlaps with the time designated for outdoor smudging, this may result in outdoor smudging being cancelled for the day.[14] Officers may also not offer outdoor smudging when there is an emergency or other severe weather.[15]

---

[6] *Id.* ¶¶ 12–13.

[7] *Id.* ¶ 11.

[8] *Id.* ¶ 7.

[9] *Id.* ¶ 14.

[10] *Id.* ¶ 15.

[11] *Id.* ¶ 23.

[12] *Id.* ¶ 42.

[13] *Id.* ¶ 19

[14] *Id.* ¶ 20

[15] *Id.* ¶ 16.

Occasionally, Plaintiffs will also make the personal decision not to smudge on a certain day. For instance, Ames may decline smudging when she feels ill,[16] and Triplett will often decline smudging when her work schedule and shower time conflicts with the practice.[17]

### B.    Grievances

A.D. 9.6 outlines the policies and procedures governing the inmate grievance process at York CI.[18] As the first step, an inmate must attempt to seek informal resolution prior to filing an inmate grievance such as by discussing the issue with the appropriate staff member or by submitting an Inmate Request Form.[19] If the inmate is not satisfied with the informal resolution, the inmate may file a Level 1 grievance by completing the Level 1 Inmate Grievance Form, attaching any relevant documents, and submitting it within "30 calendar days of the occurrence or discovery of the cause of the Grievance."[20] Each Level 1 grievance is reviewed, investigated, and decided with one of the following dispositions: rejected, denied, upheld in part, upheld, or withdrawn.[21]

An inmate may file a Level 2 grievance within five calendar days after receiving an adverse decision on a Level 1 grievance, or if the DOC failed to respond to the inmate's Level 1 grievance within 65 days of filing the Level 1 grievance.[22] In some instances, an inmate may

---

[16] *Id.* ¶ 46.

[17] *Id.* ¶¶ 64–65.

[18] *Id.* ¶ 26; *see generally* Ex. C to Def. 56(a)1, attach. 1, ECF No. 32-5 at 5–21.

[19] ECF No. 32-5 at 10.

[20] *Id.* at 10–11.

[21] *Id.* at 8.

[22] *Id.* at. 11–12.

appeal an adverse Level 2 decision by way of a Level 3 grievance.[23] A Level 3 appeal may only be filed in three circumstances: when the grievance challenges a DOC policy, challenges the integrity of the Administrative Remedies process, or when the inmate does not receive a Level 2 response within 30 business days.[24]

The record demonstrates that Plaintiffs submitted ten Level 1 grievances concerning the practice of their religion, all of which involve improper handling of medicine bags or improper denials of smudging.[25] The Court recounts those grievances and the related incidents below.

### a.     Medicinal Bag Grievances

First, both Plaintiffs have grieved the repeated mishandling of their medicine bags during shakedowns in the prison.

On September 23, 2021, and again on October 5, 2021, Ames grieved an instance of improper handling of her medicine bag that occurred on September 13, 2021.[26] The grievance submitted on September 23, 2021, was denied for failure to seek an informal resolution.[27] Plaintiff then filed another Level 1 grievance on October 5, 2021, after seeking an informal resolution by corresponding with Counselor Supervisor Barczak.[28] In the October 5, 2021,

---

[23] *Id.* at 12.

[24] *Id.*

[25] The parties dispute precisely the number of grievances filed and whether those grievances were exhausted. *See* ECF No. 54 ¶¶ 30, 31. However, there is no dispute that the documents attached to Attachment 2 of Correctional Counselor Joseph's affidavit comprise the entirety of the grievance documents concerning religious issues that Plaintiffs filed between September 13, 2021, and May 30, 2024. *See id.* ¶¶ 29, 72; *see generally* Ex. C to Def. 56(a)1, attach. 2, ECF No. 32-5.

[26] ECF No. 54 ¶ 30; *see* Ex. C to Def. 56(a)1, attach. 2, ECF No. 32-5 at 23–24, 27.

[27] ECF No. 32-5 at 27.

[28] *Id.* at 23.

grievance, Ames alleged that C.O. Duntz mishandled her medicine bag by dumping the contents on the counter during a shakedown.[29] This grievance was reviewed, and the reviewer, Warden Sexton, upheld it.[30] She found that the incident was "not done intentionally" but she would ensure that "the existing policies and procedures of A.D. 10.8 Religious Services are adhered to when handling all religious articles and religious items" such as Native American medicine bags.[31]

Approximately two years later, on December 11, 2023, Triplett submitted a Level 1 grievance concerning an instance of improper handling of her medicine bag that occurred on November 21, 2023. After a shakedown, Triplett returned to her room to find that her medicine bag was dumped and scattered across her TV stand.[32] Warden Sexton reviewed and rejected the grievance, stating that, while medicine bags shall not "normally be handled by staff," a shakedown falls outside of normal circumstances.[33] Nevertheless, Warden Sexton issued reminders "to staff regarding the treatment of religious articles and items."[34] At the bottom of the Level 1 Form, a box labeled "this decision is not subject to further appeal" is checked.[35] Warden Sexton did not identify an administrative fault in the grievance as a basis for rejecting

---

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *Id.* at 44.

[33] *Id.* at 45.

[34] *Id.* at 44.

[35] *Id.*

it.[36] Administrative Remedies Coordinator Hutchins issued an Administrative Remedy Receipt for a Level 2 Appeal in this matter, but the record does not indicate the result of that appeal.[37]

Then on January 15, 2024, Plaintiff Triplett submitted another Level 1 grievance for improper handling of her medicine bag during a shakedown on January 11, 2024.[38] In the grievance, Triplett claims that she returned to her room to find that her medicine bag was dumped out and scattered without her presence or consent.[39] Warden Sexton denied the Level 1 grievance, stating again that, while medicine bags "shall not normally be handled by staff," under A.D. 10.8.18, a shakedown "fall[s] outside of normal circumstances."[40] She also stated that she could not verify the contents of the medicine bag with a Lieutenant, and that she is "looking at making changes to this directive."[41] On March 4, 2024, Plaintiff Triplett submitted a Level 2 Inmate Grievance Appeal Form appealing Warden Sexton's denial of the Level 1 grievance. On review, District Administrator Garcia upheld Warden Sexton's decision in part, stating that "[t]he response provided by Warden Sexton was appropriate," but that the "staff have been reminded [of] the policy in regards to the respect and handling of religious articles and items."[42] A box labeled "this decision is not subject to further appeal" is checked on the Level 2 form.[43]

---

[36] *Id.* at 44–45.

[37] *Id.* at 46 (Administrative Remedy Receipt for a Level 2 Appeal of a grievance with IGP #139-24-50).

[38] *Id.* at 84.

[39] *Id.*

[40] *Id.* at 85.

[41] *Id.*

[42] *Id.* at 91.

[43] *Id.*

### b.    Smudging Grievances

Next, over the course of two years, Plaintiffs submitted repeated Level 1 grievances concerning improper denials of smudging by York CI staff.

First, on November 10, 2021, Ames submitted a Level 1 grievance requesting re-training of C.O. Neil because C.O. Neil repeatedly denied smudging.[44] Warden Sexton rejected the grievance administratively because it failed to state the relevant factual information "simply and coherently."[45] Ames resubmitted this grievance on November 30, 2021, and Warden Sexton rejected it again because the resubmitted grievance did not correct the defects with the original one.[46] On each Level 1 form, a box titled "this decision is not subject to further appeal" is checked.

Approximately a year later, on October 15, 2022, Ames submitted a Level 1 grievance concerning improper denials of smudging during the COVID-19 pandemic. In the grievance, Plaintiff Ames states that she was prohibited from smudging while the facility was in Phase 2 or Phase 3 lockdowns.[47] Warden Sexton upheld this grievance. As remedial action, Warden Sexton worked with Religious Services to revise the policies of the Native American Smudging Program and the York CI COVID-19 Operational Response Plan to ensure that every inmate had the opportunity to smudge regardless of the facility's lockdown Phase.[48]

---

[44] *Id.* at 34.

[45] *Id.*

[46] *Id.* at 31.

[47] ECF No. 32-5 at 39.

[48] *Id.*

On December 11, 2023, Triplett submitted a Level 1 grievance concerning repeated denials of daily smudging by York CI staff.[49] Specifically, she stated:

> On November 17, 2023 I wrote CS Clements about our lack of smudging at the unit at night. I have been keeping track of the staff & the reasoning for us not smudging at night. For the past few months we have smudged a total of 30 times. For August only 8 times; for September 11 times; for October 8 times & for November 3 times. Most times COs did not feel like going to get our smudging material & just found it easier to deny us our religious right. I'm requesting re-education & may be filing litigation to seek monetary compensation.[50]

Warden Sexton upheld this grievance. She obtained a copy of Triplett's personal smudging log on December 13, 2023, from Administrative Remedies Coordinator Hutchins.[51] After reviewing Triplett's personal log and the institutional logs, Warden Sexton responded to the violation by stating that York CI is "looking to revise facility policy to better ensure opportunities for smudging are provided daily unless group services are held."[52]

A few weeks later, on January 3, 2024, Ames grieved an incident of improper denial of smudging by C.O. Lebron and C.O. Johnson that occurred on December 22, 2023.[53] According to the grievance, those staff members stated that they could not accommodate Ames's request for smudging because they were required to clean the floors at 9:00 p.m.—which is

---

[49] *Id.* at 48.

[50] *Id.*

[51] *Id.* at 77.

[52] *Id.* at 49.

[53] *Id.* at 80. Within this grievance, Plaintiff Ames references two additional instances of improper smudging denials that do not appear in the Complaint. The Court will not consider allegations that are not included in the Complaint, and accordingly, those instances are not recounted here. *See Cannady v. Bd. of Trustees of Boilermaker-Blacksmith Nat'l Pension Tr.*, No. 19-CV-714, 2020 WL 4748055, at *6 n.7 (N.D.N.Y. Aug. 17, 2020), *aff'd*, No. 20-3141-CV, 2022 WL 151298 (2d Cir. Jan. 18, 2022) ("Courts in this Circuit have held that they will not consider new claims asserted for the first time at summary judgment that were not raised in the complaint.").

approximately the same time smudging is offered at York CI.[54] Warden Sexton upheld this decision in part, stating that the grievance is being taken "very seriously" and that the administration is working to ensure daily opportunities for smudging.[55]

Finally, on January 16, 2024, Ames submitted a Level 1 grievance of improper denial of smudging that occurred on January 6, 2024.[56] In the grievance, Ames alleges that C.O. Hunter improperly refused smudging because of a forecasted snowstorm. But at 9:00 PM, when smudging ordinarily takes place, there was only a dusting of snow on the ground and the facility was not locked down due to weather.[57] Warden Sexton rejected this claim upon review, stating that any determination requires consideration the "security, order or safety" of the facility and community. Here, according to Warden Sexton, the "determination was made to suspend smudging as a preventative and protective factor" because the weather forecast "indicated significant snow and while that amount had not yet fallen, conditions were icy and dangerous."[58] Plaintiff Ames appealed this decision by submitting a Level 2 Inmate Grievance Appeal Form on February 1, 2024.[59] Upon review, District Administrator Garcia upheld Warden Sexton's decision in part, stating that "[t]he response provided by Warden Sexton was

---

[54] *Id.* at 80; *see also* ECF No. 54 ¶ 42.

[55] ECF No. 32-5 at 81.

[56] *Id.* at 104.

[57] *Id.*

[58] *Id.* at 106.

[59] *Id.* at 97.

appropriate[,]" and reminding Plaintiff Ames that she was "permitted to smudge within [her] cell utilizing the feather."[60] The Level 2 decision was not subject to Level 3 appeal.[61]

## II.   **LEGAL STANDARD**

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).[62] A fact is material when it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary" are not material—they cannot preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. *Id.* The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010).

It is the moving party's burden to establish the absence of any genuine issue of material fact. *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). The Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a reasonable inference could be drawn in the

---

[60] *Id.*

[61] *Id.*

[62] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

non-movant's favor on the relevant issue, summary judgment is improper. *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). There must be evidence on which the jury reasonably could find for the non-moving party. *Dawson v. Cnty. of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004).

## III.   DISCUSSION

Defendants challenge Plaintiffs' claims for (1) failure to exhaust administrative remedies under the Prison Litigation Reform Act ("PLRA"); (2) for failure to establish the elements of their claims; (3) and because each of the defendants are entitled to qualified immunity.[63] In addition, Defendants assert that all claims against Warden Sexton and Deputy Warden because they had no direct involvement in incidents alleged by Plaintiffs. For the following reasons, Plaintiffs' Establishment Clause, Equal Protection, and a number of their Free Exercise and RLUIPA claims are dismissed. Additionally, the claims against Warden Sexton and Deputy Warden Beaton are also dismissed.

### A.   Exhaustion of Administrative Remedies

Defendants move for summary judgment on several of the Plaintiffs' claims on the basis that the Plaintiffs failed to exhaust their administrative remedies.[64] In the Complaint, Plaintiffs allege over fifty rights violations involving the practice of their religion. This

---

[63] ECF No. 32.

[64] ECF No. 32-1 at 6.

12

includes claims involving improper medicine bag searches, the lack of a Native American Elder to provide religious services, and a disproportionate favoring of the practice of other religions at York CI. It also includes repeated, individualized instances of improper denials of smudging.[65]

Defendants contest every claim as unexhausted, except the claims concerning the following issues: (1) the September 13, 2021, search of Plaintiff Ames's medicine bag; (2) the general smudging policy at York CI; (3) the York CI smudging policy during the COVID-19 pandemic; (4) the alleged improper smudging denial by C.O. Lebron on December 22, 2023; and (5) the alleged improper smudging denial by C.O. Hunter on January 6, 2024.[66]

In response, Plaintiffs allege that they complied with the exhaustion requirement by submitting numerous grievances concerning denials of their right to participate in their religious practices. In particular, they cite to the log referenced in Plaintiff Triplett's December 11, 2023, grievance as evidence that Plaintiffs provided York CI staff with notice of each instance of denial of their religious practices.[67] Plaintiffs also argue that they were precluded from filing individual grievances for each claim because it would have caused them to violate A.D. 9.6, which states that an inmate may be abusing the grievance process if they file more than 8 grievances in a 60-day period.[68] And, in the alternative, Plaintiffs argue that any failure

---

[65] *See generally* ECF No. 1.

[66] ECF No. 32-1 at 8. Defendants also state that they do not challenge "Plaintiff Triplett's exhaustion as to claims against C.O. Lebron for alleged smudging denials during December 4–8, 2024." *Id.* That date is months after Defendants filed their Complaint in this matter, and there are no Level 1 grievances in the record corresponding to those dates. Accordingly, the Court will not consider this admission, as it is likely a minor typographical error.

[67] ECF No. 55 at 6.

[68] *Id.*

to exhaust administrative remedies is excused because, despite their grievances, the York CI staff continued improperly handling Plaintiffs' medicine bags, continued improperly denying Plaintiffs opportunities smudge, and Plaintiffs still did not have access equal access to religious services.[69]

"PLRA exhaustion is a standard affirmative defense." *Perttu v. Richards*, 605 U.S. 460, 469 (2025) (holding that "parties are entitled to a jury trial on PLRA exhaustion when that issue is intertwined with the merits of a claim protected by the Seventh Amendment"). The PLRA requires a person who is incarcerated to exhaust administrative remedies before filing a federal lawsuit regarding prison conditions. *See* 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life[.]" *Porter v. Nussle*, 534 U.S. 516, 532 (2002). "Exhaustion is mandatory—unexhausted claims may not be pursued in federal court." *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011); *see also Jones v. Bock*, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court.").

Prisoners "cannot satisfy the PLRA's exhaustion requirement solely by . . . making informal complaints" to prison officials. *Macias v. Zenk*, 495 F.3d 37, 44 (2d Cir. 2007); *see also Day v. Chaplin*, 354 F. App'x 472, 474 (2d Cir. 2009) (affirming grant of summary judgment for failure to exhaust administrative remedies and stating that informal letters sent to prison officials "do not conform to the proper administrative remedy procedures"). Instead, the PLRA requires "proper exhaustion," meaning the inmate must use all steps required by the administrative review process applicable to the institution in which he is confined. *Jones*, 549

---

[69] *Id.* at 7–8.

U.S. at 217–18; *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion, which "is mandatory," necessitates "using all steps that the [government] agency holds out, and doing so properly"). "Compliance with prison grievance procedures . . . is all that is required by the PLRA to 'properly exhaust'" because "it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218.

### 1.    Excusal from Administrative Remedies Process

As an initial matter, Plaintiffs were not excused from the requirement to exhaust their administrative remedies. "The failure to exhaust administrative remedies is only excusable if the remedies are unavailable." *Reberio v. Guadarrama*, No. 23-CV-238 (VAB), 2026 WL 622742, at *5 (D. Conn. Jan. 30, 2026) (citing *Ross v. Blake*, 578 U.S. 632, 642 (2016)). The Supreme Court has identified three circumstances where an administrative remedy is unavailable. First, when "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 578 U.S. at 643. Second, when the "administrative scheme [is] so opaque that it becomes, practically speaking, incapable of use[.]" *Id.* Third, an administrative remedy may be unavailable when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 644. The Second Circuit has explained that these three circumstances "are not exhaustive" of all of the circumstances in which an administrative remedy can be considered unavailable. *Romano v. Ulrich*, 49 F.4th 148, 155 (2d Cir. 2022).

Here, Plaintiffs present two arguments as to why they should be excused from exhausting their claims. First, that they were functionally unable to grieve each instance of denial of their religious rights because they could not file more than eight grievances within a sixty-day period; and second, that the administrative remedies procedure was ineffective,

because the available remedies were a "dead-end," and did not provide meaningful relief. The Court disagrees.

As to the first argument, Plaintiffs could—and did—file multiple grievances in the same Level 1 grievance form. For instance, in Plaintiff Ames's January 3, 2024, grievance, she grieved three instances of smudging denial on the same form, all of which were upheld.[70] Thus, although Plaintiffs were aware of the option to grieve multiple incidents on the same Level 1 grievance form, they did not regularly do so. Further, there is no suggestion that Plaintiffs were found to have abused the administrative process and were accordingly barred from submitting further grievances. Rather, Plaintiffs present a speculative argument that they *may* have been barred from filing further grievances if they submitted individual grievances for each improper restriction on their right to practice their religion. This is insufficient evidence to demonstrate that A.D. 9.6 precluded them from filing their grievances and that the administrative scheme was "incapable of use." Accordingly, Plaintiffs were not excused from exhausting their remedies under this framework.

As to the second argument, the administrative procedures process did not operate as a "dead-end" for the Plaintiffs. Rather, Warden Sexton repeatedly issued meaningful responses to Plaintiffs' grievances and addressed their concerns. For instance, in response to Ames's complaint of smudging denial during COVID-19 lockdowns, Warden Sexton implemented "immediate changes" to the Native American Smudging Program, Unit Direct and the York CI COVID-19 Operational Response Plan to ensure that "all inmates have the opportunity to

---

[70] ECF No. 32-5 at 80.

16

smudge[.]"[71] Likewise, Warden Sexton regularly issued reminders to staff regarding the treatment of religious of religious articles and items in response to grievances of improper handling of medicine bags.[72] York CI was also working toward revising facility policy to ensure better opportunities for daily smudging in response to Plaintiffs' complaints of improper denials.[73] Accordingly, the York CI staff was not unable or consistently unwilling to provide any relief—just the opposite—Warden Sexton carefully considered Plaintiffs' complaints and either enacted, or worked toward enacting, meaningful changes in response to the grievances. Thus, the process did not act as a "dead end," and Plaintiffs were not excused from complying with the administrative grievance process.

### 2.    Compliance with the Administrative Remedies Process

As Plaintiffs were not excused from complying with the grievance process, the Court dismisses every claim where Plaintiffs did not exhaust their administrative remedies. This includes the individually described allegations of improper smudging denials that were not fully grieved. It also includes any claim related to the lack of an Elder at York CI. And it includes Plaintiffs Equal Protection and Establishment Clause claims—both of which are premised on the claim that York CI provides a greater amount of weekly religious services to other religions than it provides to inmates who practice the Native American religion.

From the outset, every claim where Plaintiffs did not, at minimum, file a Level 1 grievance must be dismissed. The PLRA "requires an inmate to exhaust 'such administrative remedies as are available' before bringing suit to complain of prison conditions or actions

---

[71] *Id.* at 39.

[72] *See* ECF No. 35-2 at 23, 45.

[73] *See id.* at 49.

taken by prison officials[.]" *Riles v. Buchanan*, 656 Fed. App'x 577, 579 (2d Cir. 2016). The requirement to "properly exhaust" a claim requires inmates to comply with prison grievance procedures. *Jones*, 549 U.S. at 218. Here, the Plaintiffs attempted to bypass this process by filing a litany of claims without first initiating the grievance process at York CI. This directly contradicts the mandate of the PLRA, and thus, the Court dismisses each of the claims where Plaintiffs did not initiate the grievance process by at least filing a Level 1 grievance.

Despite Plaintiffs' contentions to the contrary, Triplett's personal smudging log did not establish individual grievances supporting otherwise unexhausted claims of improper smudging denials. A copy of the log was provided to Warden Sexton during the grievance process for Triplett's December 11, 2023, general grievance that there was a pattern of improper smudging denial. The personal log certainly supports that grievance. However, it does not act as a substitute for exhausting grievances of each allegation of improper smudging denial. *See Day*, 354 F. App'x at 474  (informal letters of complaint that "do not conform to the proper administrative remedy procedures established by the Connecticut Department of Correction" are insufficient to properly exhaust administrative remedies). Accordingly, providing Warden Sexton with a copy of her personal smudging log did not exempt Triplett from exhausting the administrative remedies process before seeking relief in court. *See Porter*, 534 U.S. at 532 ("Exhaustion is mandatory—unexhausted claims may not be pursued in federal court."). Thus, every claim for which Plaintiffs did not, at minimum, submit a Level 1 grievance must be dismissed.

As to the remaining claims, Defendants state in their motion for summary judgment that they do not contest exhaustion of five of Plaintiffs' claims: (1) the September 13, 2021, search of Plaintiff Ames's medicine bag; (2) the general smudging policy at York CI; (3) the

18

York CI smudging policy during the COVID-19 pandemic; (4) the alleged improper smudging denial by C.O. Lebron on December 22, 2023; and (5) the alleged improper smudging denial by C.O. Hunter on January 6, 2024.[74] The Court agrees with Defendants that Plaintiffs sufficiently exhausted the grievance process related to these claims.

In addition, in their Rule 56(a)1 Statement Defendants agreed that Triplett's two complaints of improper handling of her medicine bag on November 21, 2023, and January 11, 2024, were exhausted. .[75] Accordingly, there is not a genuine dispute of material fact as to whether those claims are exhausted.

The only remaining incident is the issue grieved by Ames on November 10, 2021, and November 30, 2021. The parties disagree as to whether this claim was fully exhausted.[76] Upon review of the record, it is evident that Warden Sexton "rejected" this claim because it administratively did not comply with the requirements of A.D. 9.6.[77] An "untimely or otherwise procedurally defective administrative grievance or appeal" does not satisfy PLRA's requirement of proper exhaustion of administrative remedies. *Woodford v. Ngo*, 548 U.S. 81, 83 (2006); *accord Riles*, 656 Fed. App'x at 579. Thus, the Court dismisses this claim as unexhausted under the PLRA.

---

[74] ECF No. 32-1 at 8. Defendants also state that they do not challenge "Plaintiff Triplett's exhaustion as to claims against C.O. Lebron for alleged smudging denials during December 4–8, 2024." *Id.* That date is months after Defendants filed their Complaint in this matter, and there are no Level 1 grievances in the record concerning those dates. Accordingly, the Court will not consider this admission, as it is likely a minor typographical error.

[75] ECF No. 54 ¶ 34.

[76] *Id.* ¶¶ 30–31.

[77] ECF No. 32-5 at 34.

In summary, all claims brought by Plaintiffs are dismissed, except for their Free Exercise and RLUIPA claims that were "properly exhausted" by complying with the requirements of the PLRA and York CI's administrative remedies process.

### B.    Merits of Plaintiffs' Constitutional and Statutory Claims

The Court next turns to the merits of Plaintiffs' remaining Free Exercise and RLUIPA claims. For the following reasons, the Court finds genuine issues of material fact precluding summary judgment on these claims.

### 1.    First Amendment Free Exercise Claims

"The Supreme Court has explained that inmates 'retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion.'" *Kravitz v. Purcell*, 87 F.4th 111, 119 (2d Cir. 2023) (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987)). But in the prison context, alleged violations of the right to free exercise are "judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *O'Lone*, 482 U.S. at 349. Thus, to assess a prisoner's claim of Free Exercise deprivation, a court must determine "(1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; (2) whether the challenged practice of the prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers . . . legitimate penological objective[s]." *Kravitz*, 87 F.4th at 128 (quoting *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988)). To succeed on a Free Exercise claim under § 1983, a plaintiff must establish liability of a defendant by showing that they "act[ed] with at least deliberate indifference in depriving an inmate of the ability to engage in a religious practice." *Id.* at 129.

20

Here, there is no dispute that Plaintiffs' beliefs are sincerely held.[78] Rather, the parties debate the latter two factors—whether the denials of smudging and searches of medicine bags infringed on Plaintiffs' religious beliefs, and if so, whether those actions had legitimate penological objectives.[79]

### a. Searches of Medicine Bags

There is a triable issue of fact as to whether the dumping out and scattering of Plaintiffs' medicine bags constitutes a violation of their right to practice their religion under the Free Exercise Clause of the First Amendment. As courts in this District have held, the "dumping out" of medicine bags and destruction of religious objects during a shakedown may constitute an infringement on an inmate's religious beliefs. *See Braun v. Sterno,* No. 18-CV-919 (JCH), 2018 WL 5778248, at *5 (D. Conn. Nov. 2, 2018) (inmate stated a plausible Free Exercise claim against an officer who "deliberately dump[ed] out his medicine bag" and destroyed its contents). Defendants argue that the officer's actions constitute "mere negligence," not "deliberate indifference" in dumping their medicine bags.[80] But that argument ignores the fact that prison policy prohibits officers from ordinarily handling medicine bags.[81] And, in circumstances where medicine bags require examination, all handling must be completed by

---

[78] *See* ECF No. 32-1 at 19–26; ECF No. 55 at 9.

[79] *See* ECF No. 32-1 at 19–26; ECF No. 55 at 9. Plaintiffs frame this debate within the framework of the abrogated "substantial burden" test. *See Kravitz*, 87 F. 4th at 122 ("Today we hold that a prisoner claiming a violation of the right to the free exercise of religion under § 1983 need not make a showing of a substantial burden."). Nevertheless, the Court considers Plaintiffs' arguments through the lens of the *Kravitz* factors and considers whether any of the issues raised infringed on the right of Plaintiffs to practice their religion.

[80] ECF No. 32-1 at 8–10.

[81] ECF No. 32-4 at 15.

the inmate possessing the medicine bag.[82] Thus, viewing the claims in the light most favorable to Plaintiffs, there is a genuine dispute of fact as to whether Defendants' dumping out and scattering of Plaintiffs' medicine bags during a shakedown constitutes an infringement of their religious beliefs.

There are also triable issues of fact as to whether the practice of scattering the contents of a medicine bag during a shakedown has legitimate penological goals. The prison has a clear alternative process for searches of medicine bags that does not require dumping the contents on a table. Namely, officers could have followed prison policy and conducted the search in the presence of Plaintiffs. While the goals of the shakedown may be based on safety or security concerns, there is no indication in the record that safety concerns were such that the officers had to repeatedly ignore prison policy and scatter the contents of Plaintiffs' medicine bags. The opposite conclusion, that officers are justified in dumping the contents of a sacred medicine bag during any shakedown—without additional safety or security justification—is contrary to prison policy and does not sufficiently demonstrate a legitimate penological objective. Accordingly, the Court declines to grant summary judgment on Plaintiffs' Free Exercise claims related to the searches of their medicine bags.

### b.    Denials of Smudging

There are also genuine disputes of material fact precluding summary judgment on the merits of Plaintiffs' Free Exercise claims for the repeated denials of smudging. The Second Circuit recently addressed a similar issue in *Kravitz v. Purcell*, 87 F.4th 111 (2d Cir. 2023). There, the court found an infringement of an inmate's religious beliefs when he was prohibited

---

[82] Ex. B to Def. 56(a)(1), attach. 1 (DOC Administrative Directive 10.8), ECF No. 32-4 at 15.

from praying and eating with other Jewish inmates for two consecutive evenings during Shavuot. *Id.* at 116, 128. In doing so, the *Kravitz* court overturned the district court's grant of summary judgment on the matter and stated that "what the observance of Shavuot entails is beyond the competence of a federal court." *Id.* at 128–29. Here too, there is no question of the Plaintiffs' sincerely held religious beliefs or their desire to practice their religion through smudging. Defendants argue that Plaintiffs' religious practice was not burdened because they were able to pray without smudging.[83] This Court will not begin an inquiry as to whether smudging was a central tenant of Plaintiffs' religious practice, and it will adhere to the Second Circuit's mandate that such questions are beyond the purview of federal courts. In *Kravitz*, the court found that a two-day restriction of an inmates' religious practice constituted an infringement of his religious rights. Here, Plaintiffs have faced intermittent denials of their right to smudge for over two years. Accordingly, there is, at minimum, a dispute of fact as to whether the repeated denials of smudging infringed Plaintiffs' practice of their religion.

Defendants next assert that Plaintiffs were denied opportunities for smudging due to valid penological interests—such as the need to clean the floors and incoming inclement weather.[84] First, while the need to keep inmates away from floors while they are being cleaned is, perhaps, a safety concern,[85] it is not clear that Plaintiffs' smudging practice could not be otherwise accommodated. Indeed, Warden Sexton upheld the grievance related to this incident in part and stated that "the administration is looking at ensuring opportunities for smudging

---

[83] ECF No. 32-1 at 25.

[84] *Id.* at 15.

[85] *See id* at 17.

are provided daily unless group services are held."[86] Next, as to the denial of smudging due to inclement weather, there is a factual dispute over whether the weather severe enough to deny smudging. While smudging in truly inclement weather is a safety concern, according to Plaintiffs, there was only a light dusting of snow the ground, the facility was not locked down to weather, and inmates in other sections of York CI were permitted to smudge.[87]

Plaintiffs also claim that smudging was improperly denied during Phase 2 and Phase 3 COVID-19 lockdowns at York CI. Prisons faced extreme hardships and safety concerns during the COVID-19 pandemic, and naturally there are penological interests that justify limiting the movements of inmates during a global pandemic. But here, Warden Sexton agreed with the Plaintiffs and specifically adjusted the prison policy in response to their grievance to allow for smudging during all phases of COVID-19 lockdowns. Thus, there is at least a dispute of fact as to whether there were penological interests justifying the restrictions on smudging during Phase 2 and Phase 3 of COVID-19 lockdowns while the policy was in place.

Finally, Plaintiffs also allege that there is a general practice of denying smudging for seemingly no reason.[88] Certainly, there is not a penological interest associated with denying Plaintiffs' the right to practice their religion without any justification. *See Baltas v. Chapdelaine*, 153 F.4th 328, 341 (2d Cir. 2025).

### 2. RLUIPA Claims

RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government

---

[86] ECF No. 32-5 at 42.

[87] *See id.* at 104.

[88] *Id.* at 48.

demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). In the Second Circuit, RLUIPA claims are evaluated under a burden-shifting framework. *Williams v. Annucci*, 895 F.3d 180, 188 (2d Cir. 2018). First, a plaintiff must demonstrate that "the state has imposed a substantial burden on the exercise of her religion." *Id.* Then, the burden shifts to the state to establish "that the challenged policy or action furthered a compelling governmental interest and was the least restrictive means of furthering that interest." *Id.* (quoting *Redd v. Wright*, 597 F.3d 532, 536 (2d Cir. 2010)). However, a plaintiff's remedies under RLUIPA are limited: she may seek injunctive relief under the statute, but "RLUIPA does not authorize claims for monetary damages against state officers in either their official or individual capacities." *Holland v. Goord*, 758 F.3d 215, 224 (2d Cir. 2014).

As an initial matter, Plaintiffs' only forward-looking injunctive relief requested is an "injunction to allow them the opportunity to smudge on a daily basis in the morning, unless an emergency circumstance that jeopardizes the safety and security of the prison occurs."[89] Thus, the Court construes Plaintiffs' RLUIPA claims as relating only to the improper denial of smudging by York CI staff. Any other claim under RLUIPA would need to be dismissed for lack of a remedy, since "sovereign immunity forecloses the availability of money damages as a remedy against states and state actors in their official capacities under RLUIPA." *Washington v. Gonyea*, 731 F.3d 143, 145 (2d Cir. 2013) (citing *Sossaman v. Texas*, 131 563 U.S. 277, 293 (2011)).

---

[89] ECF No. 1 ¶ 59.

That said, the Court declines to grant summary judgment on Plaintiffs' RLUIPA claims related to the improper denials of smudging for substantially the same reasons as it declined to grant summary judgment on Plaintiffs' respective Free Exercise claims. First, there is a triable issue of fact as to whether Plaintiffs faced a substantial burden on their religious claims when they were repeatedly denied the opportunities to smudge. As stated above, these consistent denials stretched across more than two years and significantly encumbered Plaintiffs' practice of their religion. Second, Defendants have not demonstrated that there is a sufficient compelling government interest that was the least restrictive means of furthering that interest. Defendants identify safety and security as the preeminent government interests of concern.[90] Of course those concerns are legitimate government interests, but Defendants offered no meaningful justification for why the consistent denials of smudging were the "least restrictive" means of pursuing this interest. Instead, they improperly argued that restrictions on Plaintiffs' religion were mere "inconveniences."[91] That is insufficient to meet the standard on summary judgment, and the Court declines to dismiss Plaintiffs' RUIPA claims for improper denials of smudging.

## C.    Qualified Immunity

Defendants assert that they are entitled to qualified immunity because it was objectively reasonable for Defendants to believe that they did not violate Plaintiffs established constitutional or statutory rights.[92] Here too, the Court disagrees.

---

[90] ECF No. 32-1 at 32–36.

[91] *Id.* at 34.

[92] *See id.* 36–39.

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). To determine whether a right is clearly established, courts look to "(1) whether the right was defined with reasonable specificity; (2) whether Supreme Court or court of appeals case law supports the existence of the right in question, and (3) whether under preexisting law a reasonable defendant would have understood that his or her acts were unlawful." *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010). Even if an officer violated a plaintiff's clearly established rights, he "will still be entitled to qualified immunity if it was objectively reasonable for him to believe that his acts did not violate those rights." *Baltas*, 153 F.4th at 335 (2d Cir. 2025) (quoting *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018)). "These protections 'balance two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Clark v. Valletta*, 157 F.4th 201, 209 (2d Cir. 2025) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "[C]ourts need not have ruled in favor of a prisoner under precisely the same factual circumstance in order for the right to be clearly established." *Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir. 2003)

### 1.    Improper Handling of Medicine Bags

Under current law, there is sufficient precedent to establish that a reasonable defendant would have understood that mishandling Plaintiffs' medicine bags violated their right to security in their religious belongings. As Justice Stevens has stated, "[a] prisoner's possession of . . . personal property relating to religious observance, such as a Bible or a crucifix, is surely

27

protected by the Free Exercise Clause of the First Amendment." *Hudson v. Palmer*, 468 U.S. 517, 547 n.13 (1984) (Stevens, *J.*, concurring in part and dissenting in part). Courts in this Circuit have relied on this portion of Justice Steven's opinion to uphold Free Exercise clause claims based on unjustified confiscation or damage to religious property in prisons. *See, e.g. Gawlik v. Quiros*, No. 23-CV-772 (OAW), 2024 WL 4819249, at *8 (D. Conn. Nov. 18, 2024) (upholding Free Exercise claim when officers harmed or confiscated religious items during a shakedown); *Morse v. Annucci*, No. 13-CV-1354, 2015 WL 5725046, at *7 (N.D.N.Y. Sept. 29, 2015) (denying qualified immunity because there was there was "sufficient precedent" to put officers on notice that an inmate has a right under the Free Exercise Clause and RLUIPA to possess a crucifix); *Malik v. City of New York*, No. 11 CIV. 6062, 2012 WL 3345317, at *12 (S.D.N.Y. Aug. 15, 2012), *R&R adopted*, No. 11 CIV. 6062, 2012 WL 4475156 (S.D.N.Y. Sept. 28, 2012) (finding that the destruction of an inmate's Quran was sufficient to state a claim under the Free Exercise Clause); *see also Mukmuk v. Comm'r of Dept. of Correctional Services*, 529 F.2d 272, 275 (2d Cir. 1976) (holding that prisoners have a right to uninterrupted possession of religious materials); *Braun*, 2018 WL 5778248, at *4 (D. Conn. Nov. 2, 2018) (finding that an officer's mishandling of a medicine bag substantially burdened an inmate's rights under the Free Exercise clause on initial review). Thus, Plaintiffs' right to security in their personal religious items was clearly established at least as early as 2021, when the first incident in this case occurred.

Additionally, it is unclear whether it was objectively reasonable for Defendants to believe that they were not violating Plaintiffs' rights under the Free Exercise Clause. On the current record, there are genuine disputes of fact as to whether the practice of scattering the contents of a medicine bag during a shakedown has legitimate penological goals. There is no

indication that there was a safety or security concern that required officers to immediately dump out the contents of the medicine bag in violation of prison policy. And no reasonable officer would think it lawful to infringe on Plaintiffs' right to security in their personal religious property without penological justification. *See Baltas*, 153 F.4th at 341. Accordingly, the Court declines to grant summary judgment on this claim when there is an outstanding dispute of material fact as to whether Defendants had a sufficient penological justification for their actions.

### 2. Denials of Smudging

The Court also declines to dismiss Plaintiffs' claims on the basis that Defendants were entitled to qualified immunity for violations of the Free Exercise Clause and RLUIPA when they denied Plaintiffs the opportunity to smudge.

The Second Circuit recently considered this issue in *Baltas v. Chapdelaine* and reversed a district court's granting of qualified immunity on an inmate's Free Exercise claim. 153 F.4th 328, 341 (2025). In that case, an inmate sought to practice the Native American religion by smudging but was prohibited from doing so because he segregated from the general inmate population. *Id*. The Second Circuit found, based on its own precedent from 1993, that the inmate in *Baltas* had a well established "constitutional right to participate in congregate religious services," and that right was violated when prison officials denied him the opportunity to smudge with other inmates, instead requiring him to "dry smudge" in his cell. *Id.* at 340–41 (referencing *Salahuddin v. Coughlin*, 993 F.2d 306 (2d Cir. 1993) as the basis for the clearly established right to participate in congregate religious services). At that facility, MacDougall Walker CI, all smudging was done in a congregate setting. *Id.* at 341. The *Baltas* court explained that "there is no clearly established right to smudging or tobacco use for

29

religious services in prison," but there certainly is a right to participate in congregate religious services, such as congregate smudging. *Id*. And, under the Free Exercise Clause, a reasonable officer would not think it lawful "to deny this form of religious congregation without penological justification." *Id.*

The current record is ambiguous as to whether the Plaintiffs were seeking to practice smudging in a congregate setting or individually when they were denied the opportunity to smudge. The Court, therefore, cannot determine if the Plaintiffs were seeking to exercise their established right to religious congregation, as described in *Baltas*, or if they were attempting to assert the not-clearly established right of using smudging for religious services in prisons. In *Baltas*, the record demonstrated that smudging was a congregate activity at MacDougall Walker CI. But here, the record does not indicate whether the practice is the same at York CI, or if inmates smudge independently. Thus, there is a dispute of fact as to whether Defendants violated a clearly established right, which precludes the Court from granting qualified immunity at this juncture.

### D.     Supervisory Liability

Finally, the Court agrees that all claims against Defendants Sexton and Beaton must be dismissed because claims against them are only alleged against them in their supervisory capacities. "[A] plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official without relying on a special test for supervisory liability." *Tangreti v. Bachmann*, 983 F.3d 609, 620 (2d Cir. 2020). Here, as Plaintiffs have admitted,[93] this action was brought against Defendants Sexton and Beaton based exclusively on their

---

[93] *See* ECF No. 54 ¶¶ 52–53, 70, 73

30

supervisory roles. There are no allegations that these defendants were directly involved in searching Plaintiffs' medical bags or denying them opportunity to smudge. Accordingly, the Court dismisses all claims against Defendants Sexton and Beaton because they are named as defendants only in their supervisory capacities, not as participants in any underlying constitutional violations. *See Mitchell v. Martin*, No. 23-CV-902 (JAM), 2023 WL 8114344, at *7 (D. Conn. Nov. 22, 2023) (dismissing First Amendment and RLUIPA claims against supervisory defendants pursuant to *Tangreti*).

## IV.    CONCLUSION

For the foregoing reasons, the Court **DENIES** summary judgment as to Plaintiffs' Free Exercise and RLUIPA claims concerning (1) the September 13, 2021, search of Plaintiff Ames's medicine bag; (2) the November 21, 2023, search of Plaintiff Triplett's medicine bag; (3) the January 11, 2024, search of Plaintiff Triplett's medicine bag; (4) the general smudging policy at York CI; (5) the York CI smudging policy during the COVID-19 pandemic; (6) the alleged improper smudging denial by C.O. Lebron on December 22, 2023; and (7) the alleged improper smudging denial by C.O. Hunter on January 6, 2024. The Court **GRANTS** summary judgment on all other claims. Additionally, the claims against Defendants Sexton and Beaton are dismissed.

**SO ORDERED.**

Hartford, Connecticut
March 30, 2026

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge

31